GOVERNOR, The (WAKEFIELD v.). See Case No. 17,049.

---

## Case No. 5,645a.

### The GOVERNOR CAREY.

[2 Hask. 487.][1]

District Court, D. Maine. May, 1881.

STOWAGE OF CARGO—WRECK—OFFSET OF FREIGHT —SERVICES OF MASTER.

1. Clean bills of lading, for the carriage of goods between ports where no usage to the contrary exists, require the cargo to be stowed under deck.

2. Cargo stowed on deck in violation of a contract is at the vessel's risk, unless clearly shown that it would have been destroyed if it had been loaded below deck.

3. Goods on deck, not only are too much exposed to loss, but embarrass the crew in the management of the ship; and if disaster come from a tardy response of the crew in working ship, when they are likely to have been delayed by the deck-load, the burden is upon the master to show that the deck-load was not the cause of the disaster.

4. In case of wreck from the fault of the master in carrying cargo on deck, amounts paid by the owners of the cargo in recovering their property may be offset against freight and general average charges due the vessel.

5. The master cannot recover for services and expenses in saving the cargo from wreck, when his contract required its delivery at port of destination as a pre-requisite to the earning of freight.

In admiralty. Arbitration upon the claim of the owners of a vessel, in case of wreck, for the entire freight for the voyage and general average charges, less the freight, upon cargo saved, from place of wreck to port of destination, and for expenses of the master in saving and forwarding cargo, to which the owners of the cargo seek to offset their expenses of saving and recovering it, incurred on account of the disaster.

FOX, District Judge. In September last, Twitchell, Champlin & Co. shipped on board this schooner, then at New York, and bound to Portland, 750 casks of kerosene oil, at a freight of thirty-two cents per cask; fifty-five tons of pig iron were also shipped by the Portland Company at 170 cents per ton. Clean bills of lading for both oil and iron were given by her master. A portion of the oil was placed on deck, there not being room in the hold for the whole quantity. The iron was stored in three layers in the bottom of the vessel, the depth of the hold not allowing of three tiers of oil, excepting forward. On her passage down the sound, the schooner met with bad weather; her mast was broken so that she had to put into Edgartown where a new mast was procured; general average charges were thereby incurred amounting to $196.02 on the oil, and $54 upon the iron.

The vessel again started on her voyage, but, by reason of a loss of some of her sails, she again returned to Edgartown. The deficiency being supplied, she again got underway, and, being unable to get by Cape Ann, the master bore away for Boston harbor. About nine p. m., October twenty-seventh, she misstayed and went ashore on the Hardings. The wind was N. N. W., a wholesail breeze; the moon at times was obscured by clouds; the crew, six all told, left the vessel that night in her yawl with their dunnage, and rowed to old Boston light. The next morning they returned to the wreck and found the sea breaking over her, the deck-load all gone, her decks ripped up, and most of the oil washed out of her hold. 685 barrels were picked up on Nantasket beach, and afterwards taken to Portland, the salvors receiving $1.50 per barrel for their services. The iron was nearly all saved by wreckers at a salvage of thirty per cent.

The freight on the oil and iron from Nantasket to Portland was less than the entire freight from New York, and for this difference, being twenty cents per cask of oil, and seventy cents per ton of iron, the owners of the schooner claim to recover, and also the amount of general average charges, with the expenses of the master while employed in saving and sending forward the cargo after the loss of the vessel.

[1] [Reported by Thomas Hawes Haskell, Esq., and here reprinted by permission.]

The actual number of casks of oil on deck, at the time of the disaster, is in dispute. The mate testified that eighty only were on deck when they sailed from New York, to which eighteen were added at Edgartown, taken from the hold when the new mast was put in place, and which were not again stowed below on account of the difficulty in so doing; that all of the ninety-eight casks were well aft to trim the vessel, and were stowed on end, and there were none on top of the tier. These statements of the mate are confirmed by the master's testimony. Two witnesses of credit testify that the master of the schooner, after the disaster, stated to them that there were about 150 casks on deck, two tiers in height, one being on end with a riding tier on top, on the bilge. The master swears most positively that he never stated to either of these witnesses that there was a riding tier over the casks which were on their heads; but, in my opinion, he must have made some such a statement, and I am strongly inclined to the opinion that a portion of the oil was so stowed in order to bring the trim of the vessel as well aft as possible.

Jacob McLellan, also, testifies that the master of the schooner told him there were 150 casks on deck. The master says he was unwell when the cargo came on board; that it was all received and stowed by the mate, and that he has no certain knowledge of the precise number of casks on deck.

The bill of lading was signed by the master September twenty-third. The vessel sailed the twenty-fifth, and was not wrecked until twenty-seventh of October. During all that time, the master was in daily sight of his deck-load, and should have known the number of casks he had thus at his risk. The weight of the evidence is that there were about 150 casks on deck, and some of them, as I think, in a double tier.

There would seem to have been no occasion for the loss of this vessel, if there had been proper attention to their duties by those on board. The weather was not bad. Boston light, about three miles distant, was in plain sight. The sea was moderate, as six men were able in an eighteen-foot boat, with all their dunnage, to reach the light without difficulty. The master was well acquainted with Boston harbor, having, as he says, often been there. There was a bell-buoy on the Hardings, and, with reasonable care on the part of the master, who was at the wheel, this vessel should not have gone so near to those rocks as to put her ashore in case she misstayed.

Waiving this objection, there is, in my opinion, a complete answer to the claim made for freight and general average; and it is that by the wrongful stowage of this large quantity of oil on deck, this disaster was occasioned, which has resulted in the loss of eighty-five casks of the oil, and in the owners of the cargo having been sub-

jected to expenses in saving their property, far in excess of the claims here made against them by the owners of the schooner.

It is admitted that the master, having given clean bills of lading for oil, was without excuse in stowing it on deck, as it is not claimed that, by usage or custom between these ports, he was justified in so doing. His contract, therefore, being to carry all the oil in the hold, was at the vessel's risk, and if lost overboard, the owners could recover its value, unless it is clearly established that, if it had been below deck, it would certainly have been destroyed, and that its being on deck in no respect occasioned its loss.

If a ship in mid-ocean should be run down and instantly sunk in a collision, it may well be that if her master had, in violation of his contract, taken a portion of his cargo on deck, he would not be held accountable for the loss of his deck-load, as the entire cargo, without regard to its position on the ship, would have been totally lost by the accident, and the owner of the cargo would not have sustained any loss by reason of a portion having been on deck instead of below; the misconduct of the master would not in any way have occasioned the damage thus sustained by the owners, as the loss of the deck-load would not have been caused by its being on deck, but all on board, whether on deck or below, would have been, at the instant, destroyed by the sinking of the ship.

It is, however, most clearly established by numerous decisions of courts of admiralty, that "goods on deck are too much exposed thereby to loss; and not only this, but by encumbering the deck, they embarrass the crew, render the management of the vessel difficult, and in tempestuous weather endanger the safety of the vessel and the rest of her cargo." The Paragon [Case No. 10,708].

A double tier of oil casks on a part of this vessel's deck must necessarily have been attended with the consequences so clearly stated by Judge Ware. In getting forward and aft, the crew must have been greatly impeded in their movements by clambering over such a barricade, and they must have been hindered and delayed thereby in obeying the master's directions as to handling the vessel. Under these circumstances, the loss having been occasioned by the schooner's failure to come about, any delay in the execution of the order, even for a few seconds, would have been disastrous and fatal to her change of course. Delay and interruption being the natural consequences of the oil thus being wrongfully on her deck, it was incumbent on the master to satisfy me that, in the present instance, the misstaying was not caused thereby; and this he has wholly failed to do. I therefore am forced to the result, that the disaster was caused by the deck-load; and the amount which the owners of the cargo have been

compelled to pay to recover their property being greater than the balance of freight and general average charges, they are a proper subject of allowance against these claims of the owners of the schooner; and the owners of the schooner, therefore, are not entitled to demand and receive anything on account of the freight and general average from the owners of the cargo.

A claim is also made for the time and expenses of the master, after the wreck, in saving and forwarding the cargo; as this was all incurred by the master in performance of his duty and contract to deliver the cargo at Portland, and so earn his freight, he can not be allowed for these items, as is well settled in England. Schuster v. Fletcher, 2 Q. B. Div. 418.

I did not, at the hearing, understand that any claim was made in behalf of the owners of the cargo to recover from the owners of the vessel the amount expended by them in saving and recovering the cargo, over and beyond the claims for freight and general average; and I, therefore, have not passed upon said owners' claims, or made any award or decision touching the same; but have and do limit my award to the claim as made by the owners of the vessel against the owners of the cargo, which I determine to be invalid and disallow.